IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES MONROE MIMS, JR., | § | |
| ET AL. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | NO. 3-04-CV-2754-M |
| VS. | § | |
| | § | |
| DALLAS COUNTY, ET AL. | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Defendant Dallas County, Texas (the "County") has filed a motion to compel the return of a report prepared by its consulting expert that was obtained by plaintiffs after this lawsuit was filed. For the reasons stated herein, the motion is denied.

I.

The facts giving rise to this discovery dispute are largely uncontested.  On or about May 4, 2004, the County entered into a Professional Services Agreement for Consulting Services (the "Agreement" or "Original Agreement") with Health Management Associates, Inc. ("HMA"), a health care consulting firm, to study the operations of the Dallas County Hospital District ("DCHD") and recommend areas for improvement.  (*See* Def. App. at 3, ¶ 4 & 25-42).[1]  The purpose of this study was to help the County develop a long range planning and policy analysis for DCHD.  (*Id*. at 3, ¶ 4).  While the HMA study was underway but before a report was issued, the County received a letter from an attorney representing Cleo Bell McGee, the mother of James Monroe Mims, Jr., alleging

---

[1] The scope of services to be provided under the Agreement are described in the County's Request for Proposal for Long Range and Policy Analysis and HMA's response to that request.  (*See* Def. App. at 25, ¶ 3).  However, those documents have not been submitted to the court for review.

that her mentally ill son had been neglected while incarcerated in the Dallas County Jail. The letter, which was received on September 3, 2004, put the County on notice of a potential claim under the Texas Tort Claims Act. (*Id.* at 43).

In part due to information contained in the claim letter, the Dallas County Commissioners approved an amendment to the Agreement with HMA on December 7, 2004 ("Amendment No. 2"). (*Id.* at 3-4, ¶ 7 & 45-48).[2] This amendment authorized HMA to provide additional services beyond the scope of the Original Agreement, including an evaluation of various health care services and programs provided at Dallas County jails and other detention facilities. (*Id.* at 46-47, ¶ A(4)). More particularly, the amendment asks HMA to:

(1)     closely observe the intake processes at Dallas County jails and/or other Dallas County detention centers (i.e., how quickly and accurately is mental illness or potential suicide detected, how detainees are directed into care after such detection, etc.);

(2)     evaluate the capacity of the intake staff to diagnose detainees;

(3)     review and analyze suicide rates and attempted suicides at Dallas County jails and/or other Dallas County detention centers;

(4)     evaluate similarities and/or other connections between mental health care services and medical health care services for their effectiveness, appropriateness, potential for duplication of services, etc.;

(5)     observe the physical housing accommodations (i.e., use of isolation, physical restraints, etc.) of mental illness patients and mental health services in Dallas County jails and/or other Dallas County detention centers;

(6)     determine the appropriate health care provider to use for the mental health care staff at Dallas County jails and/or other Dallas County detention centers;

---

[2] Amendment No. 1, which also was approved by the Commissioners on December 7, 2004, extended the initial term of the Agreement through November 30, 2005. (*See* Def. App. at 45).

(7)     evaluate and analyze the psychotropic drug usage of detainees for effectiveness and appropriateness;

(8)     evaluate any and all suicide prevention plans of Dallas County jails and/or other Dallas County detention centers;

(9)     review and assess all of the above based on National Correctional Health Care Standards of Medical Services;

(10)    review aggregate utilization data for clinic, emergency, diagnostic, and inpatient transfers;

(11)    observe the processes for medical intake and assessment (particularly focusing on screening for Tuberculosis and other communicable diseases) at Dallas County jails and/or other Dallas County detention centers;

(12)    review and analyze multiple data sources and conduct interview with key administration and/or management of Dallas County jails and/or other Dallas County detention centers, which shall include key administration and/or management of the Dallas County Hospital District, d/b/a Parkland Health and Hospital System for the effectiveness of the similarities and/or connections between levels of care;

(13)    review a sampling of medical records for adherence to AHRQ national quality indicators;

(14)    review pharmaceutical data and processes (e.g., utilization, cost, comparison of diagnoses to drugs prescribed, etc.);

(15)    assess the existence of chronic disease management, specifically observing and analyzing the first five (5) day of incarceration for ER utilization; and

(16)    assess the potential for reduction of transfers from Dallas County jails and/or other Dallas County detention centers to Parkland for tests, specialty care, inpatient admissions, etc.

(*Id.* at 46-47, ¶ A(4)(a)).  Upon completion of its evaluation, HMA was to deliver a written report

to the County:

> identifying and addressing opportunities for development and improvement in quality and efficiency of mental heath care services and medical health care services at Dallas County jails and/or other Dallas County detention centers.  The report shall provide written recommendations and specific steps to be implemented to ensure that mental health care services and medical health care services are delivered in such a way that regulatory agency guidelines are adhered to, there is continuity between mental health care services and medical health care services during incarceration and upon release, arrangements and preparations are made to refer and/or recommend detainees into appropriate care upon release of incarceration, there is maximum effectiveness and efficiency in overall health care services within the larger mental and medical health care systems in Dallas County, which shall include Parkland and other public health care service institutions and programs.

(*Id.* at 47, ¶ A(4)(b)).

On December 30, 2004, three former inmates at the Dallas County Jail, including Mims, sued the County, former Sheriff Jim Bowles, and DCHD in federal district court for civil rights violations under 42 U.S.C. § 1983.[3]  Their complaint alleges, *inter alia*, that defendants failed to provide adequate medical care and treatment to mentally ill inmates in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs also assert claims under Section 504 of the Rehabilitation Act, 42 U.S.C. § 794a, and Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*  Shortly after this lawsuit was filed, the County again amended its Agreement with HMA ("Amendment No. 3").  (*Id.* at 49-51).  The third amendment specifically references the federal litigation and provides that the HMA report "may need to be reviewed by the Dallas County Criminal District Attorney, Civil Division, to determine what, if any portion of [the] report is or should be considered confidential and not subject to disclosure."  (*Id.* at

---

[3]  The underlying action is brought by James Monroe Mims, Jr., Clarence Lee Grant, Jr., and Kennedy C. Nickerson, by and through their respective legal representatives.  Advocacy, Inc., a non-profit corporation funded by Congress to protect the legal rights of persons with disabilities, has joined the suit seeking injunctive and declaratory relief "to mandate and require changes in the operation of the Dallas County Jail[.]"  (*See* Plf. Compl. at 3, ¶ 1.04).

49).  HMA was directed to deliver its report to the Chief of the Civil Division and not to release any portion of the report to any County official, employee, or third party unless instructed to do so in writing by the district attorney.  (*Id.* at 51, ¶ A(1)(a)).

HMA delivered its report to Robert Schell, Chief of the Civil Division, by e-mail on January 20, 2005.  (*Id.* at 4, ¶ 8).  Five days later, Schell received bound copies of the report.  Almost immediately, the County began receiving requests for copies of the HMA report under the Texas Public Information Act ("PIA"), Tex. Gov't Code Ann. § 552.001, *et seq.*  One such request was made by the Dallas Morning News ("DMN").  (*Id.* at 52).  Another request came from Laurance L. Priddy, Regional Managing Attorney for Advocacy, Inc. (*Id.* at 53).  The County denied all requests for the report.  However, the DMN somehow obtained a copy of the HMA report and published a series of articles discussing the findings and recommendations contained therein.  (*Id.* at 63).  The DMN later posted the entire report on its website.

The County made several unsuccessful attempts to protect the HMA report, which it considers privileged and confidential, from further disclosure.  After the DMN disclosed certain portions of the report in a scathing exposè on health care at the Dallas County Jail, the County, through its attorney, demanded the immediate return of the report.  (*Id.* at 63-64).  The DMN rejected this demand on First Amendment grounds.  (*Id.* at 65).  The County then asked a state district judge to order the DMN to remove the report from its website.  The judge refused.  Finally, the County sought an opinion from the Texas Attorney General that the report was privileged and exempt from disclosure under the PIA.  While the Attorney General agreed that information directly related to pending litigation may be withheld under Tex. Gov't Code Ann. § 552.103,[4]  he

---

[4] Section 552.103 of the Texas Government Code provides, in pertinent part:

   (a)    Information is excepted from the requirements of Section 552.021 if it is

determined that the HMA report was not excepted from disclosure because it "has been obtained by all parties to the litigation through discovery or otherwise[.]"  (*Id.* at 55).

On or about May 2, 2005, plaintiffs produced a copy of the HMA report to the County in their Rule 26(a) initial disclosures.  The County then filed this motion to compel the return of the report.  In support of its motion, the County argues that the report was prepared in anticipation of litigation and thus is protected under the work product doctrine.  Plaintiffs counter that the report does not constitute work product or, alternatively, that any privilege has been waived by publication in the media and by use of the report at public meetings.  An appendix of evidence containing the HMA report was submitted by plaintiffs in support of their response.  The County objects to plaintiffs' appendix and maintains that the report should have been submitted to the court *in camera* to preserve the privileged nature of the document.  These issues have been fully briefed by the parties and this matter is ripe for determination.

## II.

The federal work product doctrine, as codified in Fed. R. Civ. P. 26(b)(3), provides for the qualified protection of documents and tangible things prepared by or for a party or that party's

---

information relating to litigation of a civil or criminal nature to which the state or a political subdivision is or may be a party or to which an officer or employee of the state or a political subdivision, as a consequence of the person's office or employment, is or may be a party.

* * * *

(c)      Information relating to litigation involving a governmental body or an officer or employee of a governmental body is excepted from disclosure under Subsection (a) only if the litigation is pending or reasonably anticipated on the date that the requestor applies to the officer for public information for access to or duplication of the information.

TEX. GOV'T CODE ANN. § 552.103(a) & (c) (Vernon 2004).

representative "in anticipation of litigation or for trial." FED. R. CIV. P. 26(b)(3).[5]   Materials

prepared by a consultant are expressly covered by the work product doctrine. *Id.*; *see also Thomas*

*v. General Motors Corp.*, 174 F.R.D. 386, 388 (E.D. Tex. 1997).   Determining whether a document

is prepared in anticipation of litigation is a "slippery task." *United States v. El Paso Co.*, 682 F.2d

530, 542 (5th Cir. 1982), *cert. denied*, 104 S.Ct. 1927 (1984).   A document need not be generated

in the course of an ongoing lawsuit in order to qualify for work product protection.   However, "the

primary motivating purpose" behind the creation of the document must be to aid in possible future

litigation.   *In re Kaiser Aluminum & Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*,

121 S.Ct. 1354 (2001); *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir.), *cert. denied*, 102

S.Ct. 320 (1981).   As the advisory committee notes to Rule 26(b)(3) make clear, "[m]aterials

assembled in the ordinary course of business, or pursuant to public requirements unrelated to

litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this

subdivision." FED. R. CIV. P. 26, adv. comm. notes; *see also El Paso Co.*, 682 F.2d at 542.   Among

the factors relevant to determining the primary motivation for creating a document are "the retention

of counsel and his involvement in the generation of the document and whether it was a routine

practice to prepare that type of document or whether the document was instead prepared in response

to a particular circumstance." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D.

Tex. 2004) (Kaplan, J.), *quoting Electronic Data Systems Corp. v. Steingraber*, 2003 WL 21653414

at *5 (E.D. Tex. Jul. 9, 2003).   If the document would have been created without regard to whether

litigation was expected to ensue, it was made in the ordinary course of business and not in

anticipation of litigation. *Id.*

---

[5] Work product is not a substantive privilege within the meaning of Fed. R. Civ. P. 501. *Interphase Corp. v. Rockwell International Corp.*, 1998 WL 664969 at *4 (N.D. Tex. Sept. 22, 1998) (Kaplan, J.) (citing cases).  Therefore, the resolution of this issue is governed by federal law. *Id.*

Like all privileges, the work product doctrine must be strictly construed. *See, e.g. McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 260 (N.D. Ill. 2000) (work product doctrine "significantly restricts the scope of discovery and must be narrowly construed in order to aid in the search for the truth"); *Republican Party of North Carolina v. Martin*, 136 F.R.D. 421, 429 (E.D.N.C. 1991) (same). The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial. *Beasley v. First American Real Estate Information Services, Inc.*, 2005 WL 1017818 at *3 (N.D. Tex. Apr. 27, 2005) (Kaplan, J.); *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 400 (E.D. Tex. 2003). Once this initial burden is met, the party seeking discovery must establish a "substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." FED. R. CIV. P. 26(b)(3); *see also Ferko*, 219 F.R.D. at 400.

III.

The court has little difficulty in concluding that the County reasonably anticipated that a lawsuit would be filed on behalf of James Monroe Mims, Jr. when it hired HMA to evaluate health care services and programs at Dallas County jails and detention facilities. Indeed, plaintiffs filed this action on December 30, 2004--just three weeks after the County amended the Agreement with HMA to expand the scope of its services, including the preparation of the written report made the basis of this motion. However, that the report would not have been prepared "but for" this litigation does not, in itself, make it work product. The County still must establish that the "primary motivating purpose" behind the creation of the report was to aid in the lawsuit.

Based on the evidence submitted by the parties, the court determines that the "primary motivating purpose" for the HMA report was to assist the County in formulating remedial measures

to improve health care services at Dallas County jails and detention centers, not to aid in possible future litigation.[6]  First, the express language of Amendment No. 2 makes clear that the additional services to be performed by HMA, including the evaluation of health care services and programs at the jail and the preparation of a written report, were necessary "to meet [the] County's goals and objectives *under the Original Agreement*." (Def. App. at 45).  Those goals and objectives were to help the County develop a long range planning and policy analysis for DCHD.  (*Id*. at 3, ¶ 4).  The Mims claim was not anticipated by or even known to the County when it entered into the Original Agreement with HMA in May 2004.

Second, there is no mention of the Mims claim in Amendment No. 2.  Rather, the amendment contains a laundry list of "key areas of evaluation and assessment for mental health care services and medical health care services" to be studied by HMA.  (*Id.* at 46, ¶ A(4)(a)).  The 16 enumerated items on the list deal primarily with intake procedures, staffing requirements, suicide rates and prevention plans, transfer issues, prescription drug usage, and compliance with national standards.  (*See id.*).  Nothing in the amendment suggests that HMA was engaged to investigate the Mims claim or to provide any legal analysis or conclusions regarding potential liability.

Third, the written report prepared by HMA goes far beyond any issues involved in this litigation.  Amendment No. 2 calls for the preparation of a report "identifying and addressing opportunities for development and improvement in the quality and efficiency of mental health care services and medical health care services at Dallas County jails and/or other Dallas County detention centers."  (*Id.* at 47, ¶ A(4)(b)).  Among other things, HMA was asked to "provide written recommendations and specific steps to be implemented to ensure that mental health care services

---

[6]  In a declaration filed with the court, Schell states that "[o]ne of the primary reasons for seeking the HMA study was to investigate the circumstances giving rise to the claims of Plaintiff Mims."  (Def. App. at 4, ¶ 7).  This conclusory assertion, unsupported by any facts, is not competent evidence.

and medical health care services are delivered in such a way that regulatory agency guidelines are adhered to . . . [and] there is maximum effectiveness and efficiency in overall health care services within the larger mental and medical health care systems in Dallas County[.]"  (*Id.*).  Significantly, HMA was not asked to address the specific allegations made by Mims in his notice letter.  Nor does the report reference the Mims claim.  Indeed, the County acknowledges that the HMA report "has no relevance to the individual Plaintiffs' claims under § 1983 and the ADA."  (*See* Jt. Stat. Rep. at 19, ¶C(3)).  This evidence supports a finding that the HMA study was undertaken to assist the County in formulating remedial measures to improve general mental and medical health care services at the jail, not to aid in any potential litigation.

Such a finding is underscored by the language of Amendment No. 3.  Although the County was well aware of this litigation when it amended the Agreement in January 2005, the third amendment does not refer to the HMA report as privileged work product.  Instead, the amendment provides that the report "may need to be reviewed by the Dallas County Criminal District Attorney, Civil Division, to determine what, if any portion of [the] report is or should be considered confidential and not subject to disclosure."  (*Id.* at 49).  This language suggests that, even after the County was sued, it questioned whether the report qualified as work product.

Finally, there is no evidence that outside litigation counsel for the County directed or was involved in the preparation of the HMA report.  Nor is there any evidence that the report is being used by litigation counsel to prepare for trial or settlement negotiations.  This militates strongly against a finding that the "primary motivating purpose" behind the creation of the report was to aid in this lawsuit.  *See El Paso Co.*, 682 F.2d at 543 (documents prepared by client with assistance from in-house counsel not entitled to work product protection where outside counsel handling litigation did not rely on documents to prepare for trial or negotiations); *Steingraber*, 2003 WL 21653414 at

*5 (retention of counsel and his involvement in creation of document are important factors in determining "primary motivation").

In sum, the County has failed to establish that the "primary motivating purpose" behind the creation of the HMA report was to aid in possible future litigation.  Rather, the primary purpose of the report was to help the County formulate remedial measures to improve mental and medical health care services at the Dallas County jails and detention facilities.  The report itself summarizes the scope of additional services to be provided by HMA--to review medical and mental health care services at the jail and to recommend a set of objectives that will provide direction for specific actions needed to improve such services.  (*See* Plf. App. at 3).  The HMA report does not include any analysis of facts or legal theories designed to prepare a specific case for trial or negotiation.  Nor does the report map out any legal strategy or tactics.  Instead, HMA gave the County exactly what it asked for--a comprehensive analysis of health care services at the jail and recommendations for improvement.   This type of analysis is not entitled to work product protection.[7]

## CONCLUSION

The County's motion to compel the return of the HMA report is denied.  Because the report is not work product, the County's objection to plaintiffs' appendix is overruled.

SO ORDERED.

DATED:  July 29, 2005.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

[7]   In light of the disposition of this threshold issue, the court need not decide whether plaintiffs have a "substantial need" for the HMA report or whether the work product privilege has been waived.  However, the court questions whether the County took adequate precautions to prevent disclosure of the report to the media and other third parties.  *See Tri-County Paving, Inc. v. Ashe Co.*, 2000 WL 1811606 at *3 (W.D.N.C. Oct. 5, 2000) (holding that work product privilege was waived where County distributed legal memorandum to Commissioners and staff, discussed memo at public meetings, and contents of memo were published in local newspaper).